UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CINDY R. HALE,                              )
                                            )
            Plaintiff,                      )
                                            )
        vs.                                 )        Case No. 4:13-CV-578 (CEJ)
                                            )
CAROLYN W. COLVIN, Commissioner             )
of Social Security,                         )
                                            )
            Defendant.                      )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On November 26, 2007, plaintiff Cindy Hale filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et. seq.*, and for supplemental security income (SSI), Title XVI, 42 U.S.C. §§ 1381 *et seq.*, (Tr. 277-290), with an alleged onset date of October 19, 2007. After plaintiff's application was denied on initial consideration (Tr. 137-141), she requested a hearing from an Administrative Law Judge (ALJ). See Tr. 143-147, 149-156, 177-183 (acknowledging request for hearing).

Plaintiff and counsel appeared for a hearing on November 5, 2009. (Tr. 75-99) The ALJ issued a decision on December 9, 2009 denying plaintiff's application. (Tr. 103-121). The Appeals Council granted plaintiff's request for review. On March 9, 2011, the Appeals Council vacated the decision and remanded with instructions. (Tr. 129-133).

Plaintiff and counsel appeared for a second hearing on September 29, 2011. (Tr. 38-74). The ALJ issued a decision on February 24, 2012 denying plaintiff's application.

(Tr. 12-37), and the Appeals Council denied plaintiff's request for review on January 23, 2013. (Tr. 1-6). Accordingly, this decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability Application Documents

In her Disability Report (Tr. 351-358), plaintiff wrote that she was  5'1" tall and weighed 226 pounds.  She listed her disabling conditions as an aneurysm and headaches.  She wrote that these conditions cause her pain, fatigue, temporary driving restrictions, and an inability to lift heavy items.  She listed her past employment as a retail cashier and stocker, cook, disc jockey, manager at a beauty supply store, phone operator, residential construction, and waitress.  Plaintiff completed beauty school and three years of college.

In her Supplemental Questionnaire (Tr. 359-368), plaintiff listed her disabling conditions as an aneurysm, headaches, high blood pressure, and dizziness. Plaintiff wrote that her symptoms include pain in the "location of [her] surgery" and short term memory loss. She wrote that she experiences dizziness and sleepiness as the side effects of her medication.  Plaintiff wrote that she lives by herself and cares for her 12-year-old child every other weekend. She stated that she is able to use a checkbook, complete a money order, count change, do laundry, clean dishes, make her bed, iron, grocery shop, go to the post office, watch television, listen to music, and read.  Plaintiff wrote that because of her dizziness she is unable to vacuum or sweep, take out the trash, perform home repairs or car maintenance, mow the lawn, rake leaves, or garden. She stated that she is unable to sleep for more than four hours at a time, that she has trouble climbing the stairs to use her bathtub, that she is afraid to leave her home because she fears falling from dizziness, and that she has difficulties following

-2-

written or verbal instructions because of memory loss. Plaintiff stated that she has problems getting along with other people because she is easily aggravated and has a short temper. Plaintiff described her average daily activities as eating, taking medication, watching television, doing laundry, and going to sleep. She stated that she has a valid driver's license and is able to drive.

In her Disability Report-Appeal (Tr. 390-395), plaintiff stated that since the initial report she had developed severe back and knee pain from degenerative arthritis, increased headaches and scalp pain, a fear of dying, extreme mood changes, an inability to sleep for more than three hours, and difficulty sitting or standing for more than 30 minutes at one time. She stated that her severe back pain prevents her from bathing, using the restroom, cooking, doing laundry, cleaning, combing her hair, and shopping for groceries.

## B. Hearing on November 5, 2009

At the time of the hearing, plaintiff was 45 years old, 5'2" tall, and weighed 241 pounds. Plaintiff completed some college work and obtained a certificate in construction technology. (Tr. 80). Plaintiff testified that she drove to the hearing alone, but that she typically has someone with her when she drives because she tends to get lost. (Tr. 81). Plaintiff testified that her medication side effects include fatigue and lack of motivation. (Tr. 82). Plaintiff stated that subsequent to her alleged onset date, she worked as a hostess at a restaurant for two hours a day for four days a week. She stated that she was only employed there for one month because she was unable to do certain tasks and because they could not provide her with enough hours. (Tr. 82). After leaving that job, plaintiff visited a career center and researched possible employment, but did not submit any applications. (Tr. 83).

Plaintiff testified that she suffers from constant numbness in her right hand and pain in her back, neck, right leg and toes. (Tr. 83, 85). She testified that standing exacerbates her pain and that she can stand for about six minutes before needing to sit. (Tr. 85). Plaintiff testified that she has difficulty turning her head, reaching her arms over her head, and bending over. (Tr. 84). She stated that her mother cleans her house every two months, but that she is able to wash her own dishes, dust, do small loads of laundry, and cook simple meals. (Tr. 89).

Plaintiff testified to seeing a physical therapist who taught her stretching exercises that help alleviate her back pain. Plaintiff stated that she lies on her back and stretches at least five times per day for two to three minutes each time. (Tr. 86). Plaintiff testified that she has to use the restroom every hour and that because of this issue she wears a diaper or urinary pad. She stated that she also suffers from panic attacks three to four times a week and experiences nightmares several times each night. (Tr. 87-88). Plaintiff explained that she sleeps on and off for five hours per night and that she has trouble staying awake during the day. (Tr. 88). Plaintiff had keratitis in her right eye, but that issue had been resolved by the time of the hearing. (Tr. 90-91).

George H. Horne, M.S., a vocational expert, provided testimony regarding plaintiff's past work and current employment opportunities. (Tr. 93-98). Mr. Horne listed plaintiff's vocational history and classified each position as follows: beauty equipment supplies sales representative, light skilled work with a Specific Vocational Preparation (SVP) of 5;[1] house builder, medium skilled work with a SVP of 7;[2]

---

[1] The SVP level listed for each occupation in the Dictionary of Occupational Titles (DOT) connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. Hulsey v. Astrue, 622 F.3d

cashier/checker, light to medium semi-skilled work with a SVP of 3;[3] and short order cook, light to medium semi-skilled work with a SVP of 3.

The ALJ asked Mr. Horne to assume that plaintiff was 43 to 46 years of age, that she had greater than a high school education, that she performed the jobs previously described, and that she had a history of a ruptured aneurysm, status post-clipping, headaches, post-traumatic stress disorder, generalized anxiety disorder, degenerative disc disease of the lumbar and cervical spine with a congenital fusion at cervical disk 3/4, obesity, stress and urge urinary incontinence, hyperlipidemia, high blood pressure, history of a fracture of the left fifth metatarsal, and filamentary keratitis. The ALJ asked Mr. Horne to further assume that plaintiff was restricted to performing only sedentary work, with a limitation of lifting and carrying up to 10 pounds occasionally, 5 pounds frequently, standing and walking up to 2 hours a day for no more than 30 minutes at a time, and sitting for 6 to 8 hours in an 8-hour work day, with a need to alternate sitting with standing at approximately 30-minute intervals. The ALJ added additional limitations, including: no exposure to significant heights, unguarded moving machinery, or extreme vibration, no commercial driving, a need for a climate controlled work environment, a need for simple repetitive job instructions, no contact with the public, and no more than minimal contact with coworkers and supervisors.

The ALJ then asked whether an individual with the above restrictions would be able to perform plaintiff's past work. Mr. Horne answered in the negative and explained

917, 923 (8th Cir. 2010). SVP level 5 covers occupations that require over 6 months up to and including 1 year. 20 C.F.R. § 656.3.

[2] SVP level 7 covers occupations that require over 2 years up to and including 4 years. Id.

[3] SVP level 3 covers occupations that require over 30 days and up to and including 3 months. Id.

-5-

that all of plaintiff's past work would require the individual to be on his or her feet the majority of the work day. Mr. Horne further testified that an individual with the above restrictions could perform the work of a final assembler (of which there are 1,000 jobs in Missouri) and a table worker (of which there are 800 jobs in Missouri). However, Mr. Horne testified that these jobs would be precluded if the hypothetical individual needed to have access to a restroom on an hourly basis.

### C. Hearing on September 29, 2011

At the start of the hearing, the ALJ briefly summarized plaintiff's medical record by listing obesity with lumbago and sciatica, bilateral upper extremity cervicalgia, and lumbar degenerative disc disease with arthrosis as plaintiff's diagnosed impairments. The ALJ noted that the medical record contained references to insomnia, persistent disorder of wakefulness, incontinence, possible cervical herniation, Baker's cyst of the right knee, generalized anxiety disorder, post-traumatic stress disorder, cervical degenerative disc disease, congenital cervical fusion, possible extrusion at 25F/8, and depressive disorder. (Tr. 41, 43).

Plaintiff testified to being 5'3" tall and weighing 248 pounds. She stated that her last job was as a restaurant hostess, but that she quit because it was too painful to walk. (Tr. 43). Plaintiff stated that she was not seeing a therapist for her depression because she had lost her Medicaid benefits. (Tr. 43-44). She stated that she saw a therapist on a weekly basis from 2009 to 2010, but she could not remember his name.[4] (Tr. 62-64). Plaintiff stated that she has difficulties turning her head and holding her arms out and that she has pain at her waistline that radiates down to her lower

_____

[4] The ALJ left the record open for 30 days after the hearing in order for plaintiff to submit medical records documenting these 2009-2010 therapy appointments. Plaintiff failed to submit any additional records. [Doc. #10-3, at p. 25].

extremities. (Tr. 46-48). She stated that she no longer receives treatment for her pain because she has no Medicaid coverage.  But, when she was receiving treatment she was given injections which allowed her to perform certain activities with less difficulty. (Tr. 47, 55). Plaintiff was told by her doctor to obtain a polysomnogram so that the cause of her insomnia could be determined.  Plaintiff testified that she did not get the test because her "Medicaid ran out." (Tr. 48).

Plaintiff stated that she smokes a pack of cigarettes per day. Plaintiff explained that she used to smoke a pack and a half per day, but that she cut down because of the expense. (Tr. 49-50).  Plaintiff stated that she does not drive and does not use an ambulatory device. (Tr. 50-51).  She testified to having an aching pain in her right knee, but described it as the least of her problems. (Tr. 51-52). Plaintiff stated that her back pain is exacerbated by standing, walking, or bending. (Tr. 53-54). She stated that she used to take hydrocodone for the pain, but that her current treatment facility does not dispense narcotics. (Tr. 54). She testified that she has constant numbness and tingling in her hands and difficulties gripping items. (Tr. 55-56). Plaintiff stated that she has incontinence and that she urinates on herself when coughing, sneezing, bending over, or laughing.  Plaintiff stated that she has to change her clothes or urinary pad approximately 15 times per day. (Tr. 56-57).

Plaintiff stated that she feels hopeless most of the time and that she frequently cries and does not want to be around others.  Plaintiff stated that her pain exacerbates the depression and that at least three days a week she wakes up in extreme pain. (Tr. 58). She testified that she can tolerate sitting for 15 to 20 minutes before she needs to stand. (Tr. 59). Although she lives in a two-story townhouse, plaintiff typically sleeps downstairs because climbing the stairs causes pain in her lower back. (Tr. 60).  Plaintiff

stated that her mother and a friend clean her house. (Tr. 60-61). Plaintiff stated that on a typical day she reads, sleeps, and takes a bath. She stated that she has some problems concentrating when she reads and that she tries to avoid watching television because it makes her sleepy. (Tr. 61). Plaintiff stated that a friend takes her to the grocery store and that she uses a wheelchair while shopping. She is not involved in any activities outside of the home. (Tr. 62).

Terri Crawford, M. Ed., a vocational expert, provided testimony regarding plaintiff's past work and current employment opportunities. (Tr. 64-73). Ms. Crawford classified plaintiff's previous positions as follows: cook, light semi-skilled work with a SVP of 3; house builder, medium skilled work with an SVP of 7; and cashier II, light unskilled work with an SVP of 2. (Tr. 67-68).

The ALJ asked Ms. Crawford about the available employment opportunities for a hypothetical individual with the same vocational background as plaintiff who has the following limitations: overarching residual functional capacity for sedentary work; no reaching above the head bilaterally; decreased use of the neck by ten degrees in all directions; no bilateral pushing or pulling with the lower extremities; occasional bending, twisting and turning; no crawling or kneeling for competitive purposes; less than occasional stooping and squatting; occasional stair climbing; no climbing of ropes, ladders, or scaffolds; frequent gripping, grasping, wrist movements, handling, fingering, and feeling; no pushing or pulling of levers with the upper extremities bilaterally; no use of air or vibrating tools or motor vehicles; no work at unprotected heights; no work in extreme cold, heat or humidity; occasional contact with the public, co-workers, and supervisors; and a marked limitation in carrying out complex instructions.  (Tr. 69-70).

Ms. Crawford stated that such an individual could not perform any of plaintiff's past work. However, she testified that the hypothetical individual could perform some sedentary, light unskilled work in the national economy, including production assembler (of which there are 750 jobs in Missouri); general clerk (of which there are 1,200 jobs in Missouri); and electronics assembler (of which there are 1,400 jobs in Missouri). (Tr.70).

The ALJ then asked about the available employment opportunities for the same hypothetical individual, but with an additional limitation that she have no contact with the public. Ms. Crawford stated that the general clerk job would be eliminated from the list of available employment, but that the hypothetical individual could perform the sedentary, medium unskilled work of a hand packager (of which there are 1,200 jobs within the state of Missouri). (Tr. 70-71).

Ms. Crawford further testified that if the hypothetical individual was limited to only occasional handing, then that individual would not be able to perform any of the listed jobs or any other jobs in the national economy. (Tr. 71-72). Ms. Crawford also testified that if the individual could not perform activities within a schedule or maintain regular attendance or be punctual, then that individual would also not be able to perform any of the listed jobs or any other jobs in the national economy. (Tr. 72).

### D. Medical Evidence

On October 15, 2007, plaintiff went to the emergency room at St. John's Regional Health Center with complaints of right eye pain. She was given an eye ointment, an oral antibiotic, and told to follow up with a ophthalmologist. (Tr. 575, 581-586). Plaintiff followed up with William Hecox, O.D., at the Walmart Vision Center who diagnosed her with filamentary keratitis. (Tr. 515).

-9-

On October 17, 2007, plaintiff went to the emergency room at St. John's with complaints of head pain, nausea, and vomiting. (Tr. 456-458, 469-70, 536-537). A head CT scan revealed a subarachnoid hemorrhage. (Tr. 459, 473, 538). Further testing revealed a right internal carotid aneurysm. (Tr. 471-472, 474-475, 539). On October 19, 2007, plaintiff underwent a craniotomy for clipping of the aneurysm. (Tr. 479-480, 544-545). Plaintiff was discharged in stable condition on October 29, 2007. (Tr. 489-490, 552). Discharge paperwork states that she was receptive to cigarette smoking cessation. (Tr. 553). On October 30, 2007, plaintiff saw her primary doctor for a blood pressure check. (Tr. 592-593).

On November 12, 2007, plaintiff saw Allison Randle, PA ES, at St. John's Spine Center for a postoperative follow up appointment. (Tr. 466, 530-534). Plaintiff reported some headaches, but denied nausea, vomiting, visual changes, and dizziness. Plaintiff was told that headaches were normal subsequent to a clipping. Plaintiff reported that she had quit smoking. After physical examination, plaintiff was described as alert and oriented, in no apparent distress, neurologically intact and stable, and doing extremely well. The restrictions on any type of straining or activity were lifted.

On January 10, 2008, a medical consultant completed a physical residual functional capacity assessment (PRFCA). (Tr. 381-386). The consultant determined that plaintiff had the capacity to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; frequently climb ramps or stairs; and frequently balance, stoop, kneel, crouch, or crawl. She was restricted from climbing ladders, ropes, or scaffolds, and restricted from encountering hazards such as machinery or heights.

On January 15, 2008, plaintiff went to the Ozarks Community Hospital for a blood pressure check. She also complained of scalp pain. Plaintiff's was prescribed Atenolol.[5] (Tr. 502-503). On January 21, 2008, plaintiff saw Ms. Randle for another post-operative follow-up appointment. Plaintiff reported minimal headaches, memory loss, anxiety, and sleep deprivation. Plaintiff expressed that she was often worried about having another ruptured aneurysm. The treatment notes state that while plaintiff did not appear to be depressed, seeing a counselor could be worthwhile. (Tr. 629). Plaintiff returned to Ms. Randle on July 28, 2008 with reports that she was doing well and that she suffered from occasional migraines and anxiety. Ms. Randle suggested that she see a psychotherapist. (Tr. 626). On August 17 2008, plaintiff went to the emergency room at St. John's with complaints of back pain. (Tr. 623). She was discharged the same day with instructions to ice her back. She was prescribed Norco[6] and Flexeril.[7]

On August 20, 2008, plaintiff saw David Paff, M.D. for a disability evaluation at the request of the Department of Family Services. (Tr. 505-507, 519-523). Dr. Paff wrote that during the physical examination plaintiff would not attempt to walk without her walker, could not get up on the examination table, and would not bend forward or squat. Dr. Paff wrote that the exam was difficult because plaintiff was unable to

---

[5] Atenolol is used alone or in combination with other medications to treat high blood pressure.

[6] Norco is the brand name for hydrocodone and is prescribed to relieve moderate to severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (last visited Apr. 15, 2014).

[7] Flexeril is the brand name for Cyclobenzaprine and is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html (last visited Apr. 15, 2014).

cooperate. An electrocardiogram revealed normal results; a cervical spine x-ray showed congenial fusion at C3 and C4 and degenerative disc disease at C4-5, C5-6, and C6-7; a lumbar spine x-ray showed mild diffuse lumbar degenerative disc disease and mild L5-S1 facet joint arthrosis; and laboratory testing showed elevated blood glucose and elevated white count with a left shift. Dr. Paff wrote that plaintiff was morbidly obese with hypertension, hyperlipidemia, keratitis of her right eye, a Baker's cyst in her right knee, some degenerative disc disease, and possible early diabetes. Dr. Paff concluded that it was "not possible to be sure that she will be disabled for a year, but she may well be, as she has multiple health problems." (Tr. 507).

On August 25, 2008, plaintiff went to the emergency room at St. John's with complaints of right leg numbness. (Tr. 618, 621). A CT scan of the lumbar spine revealed mild disc degeneration and spondylosis with no evidence of fracture or listhesis. (Tr. 620). She was discharged on the same day with a diagnosis of low back pain and parasthesia of the right posterior leg, thigh, and buttocks. She was instructed to stay in bed for three days, minimize pressure on the right buttock, and take Ibuprofen and Tramadol[8] as needed for pain. (Tr. 619).

On September 22, 2008, plaintiff saw Michelle Barg, M.D. in order to establish a primary care physician. On September 29, 2008, plaintiff returned to Dr. Barg with complaints of chronic low back pain. Plaintiff was provided a Vicodin refill. (Tr. 606). On October 20, 2008, plaintiff saw Dr. Barg for a follow-up appointment regarding her back pain. Dr. Barg noted that the CT scan revealed no abnormalities and the MRI

---

[8] Tramadol is in a class of medications called opiate (narcotic) analgesics and is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlinep lus/druginfo/meds/a695011.html (last visited Apr. 15, 2014).

revealed no significant disc abnormality. Dr. Barg referred plaintiff to a pain management specialist and a physical therapist. (Tr. 602-603).

On October 27, 2008, plaintiff saw Osvaldo Acosta-Rodriguez, M.D. for low back pain radiating to her right hip. Dr. Acosta-Rodriguez performed a standard distraction of the leg, an adjustment of the pelvis, and a lumbar roll. At the end of the appointment, plaintiff was completely in alignment throughout her thoracic and lumbar spine and the pelvis and SI joints. (Tr. 604-605). Plaintiff reported that her pain had decreased dramatically. An x-ray of the right hip showed no abnormalities. (Tr. 666). Her diagnosis was listed as right SI joint dysfunction and lumbar and pelvic somatic dysfunctions. (Tr. 604). The following day, plaintiff saw Dr. Barg with complaints of right-side rib pain. Plaintiff reported that she did not have any back pain. (Tr. 600-601). On November 3, 2008, plaintiff saw Dr. Barg for a cracked lip and a swollen chin. She was diagnosed with impetigo and prescribed an antibiotic. (Tr. 599).

On October 29, 2008, plaintiff began physical therapy with Kerri Wallace, MPT. (Tr. 695-696). Plaintiff tolerated treatment with continuous verbal and visual expressions of pain. However, Ms. Wallace wrote that plaintiff's pain appeared to be alleviated. Plaintiff returned for physical therapy on November 4, November 11, November 18, and November 26, 2008. (Tr. 692-693).

On November 20, 2008, plaintiff saw Dr. Acosta-Rodriguez for a follow up appointment. (Tr. 661-663). Plaintiff reported that she was doing well, but that two days prior she began to have right hip pain while doing housework. She denied lower back or rib pain. A physical examination revealed excellent range of motion, normal joint examinations, no evidence of weakness or asymmetry, and possible lumbar and pelvic somatic dysfunction. Dr. Acosta-Rodriguez adjusted her lumbar spine and S1

-13-

joint and administered an injection of Depo-Medrol and lidocaine, which plaintiff reported completely relieved the pain.

On December 3 and December 11, 2008, plaintiff returned to physical therapy. She reported that her back pain was a 6 on a 10-point scale. She stated that her pain increased since beginning a job as a cook at a restaurant where she worked four hours per day. (Tr. 690-691). On December 5, 2008, plaintiff was administered a cervical facet pain injection. (Tr. 731-732). Plaintiff continued receiving physical therapy until May 19, 2009, which is documented as her last appointment. (Tr. 676).

On January 29, 2009, plaintiff saw Dr. Brian Edwards, D.O. for increased sinus drainage. She was diagnosed with sinusitis and bronchitis. (Tr. 598). On the same day, plaintiff saw Dr. Acosta-Rodriguez for an unscheduled follow up appointment after missing several visits. (Tr. 659-660). Plaintiff had no complaints of pain and reported that she had discontinued her pain medications. A physical examination revealed normal trochanteric bursa; mild lumbosacral fascia edema; negative straight leg raises; normal heel walking, toe walking and squatting; normal flexion, extension, side bending and rotation of the lumbosacral spine; and normal flank examination. Dr. Acosta-Rodriguez encouraged plaintiff to do knee-to-chest exercises.

On February 10, 2009, plaintiff returned to Dr. Acosta-Rodriguez for a follow-up appointment and complaints of joint pain. (Tr. 657-658). A physical examination revealed that she was able to move all limbs spontaneously; had a normal gait pattern; was negative for back edema; had low chronic lumbosacral fascia scarring and right SI joint somatic dysfunction that was easily adjusted using simple distraction; negative straight leg raises; and normal heel walking, toe walking, and squatting. A pain injection was administered in plaintiff's right SI joint soft tissue.

-14-

On March 3, 2009, plaintiff saw Dr. Edwards complaining of post-brain surgery difficulties and trouble with her urinary incontinence. Dr. Edwards referred her to a urologist and recommended counseling for her post-surgical trauma. (Tr. 597). On March 10, 2009, plaintiff returned to Dr. Acosta-Rodriguez for a follow-up appointment. (Tr. 655-656). Plaintiff complained of joint pain and buttocks pain. A physical examination revealed a tender piriformis muscle on her right gluteal region; negative straight leg raises; normal strength; fairly significant SI joint dysfunction; and no edema. An injection was administered in three separate spots along the piriformus and her SI joint was readjusted. Plaintiff received additional SI joint injections on March 27, 2009 and April 21, 2009. (Tr. 669-674).

On March 26, 2009, plaintiff saw Eric Vogt, M.D. at Urology Care, Inc. The treatment notes listed plaintiff's diagnosis as mixed urinary incontinence and stress urinary incontinence. Plaintiff reported that she typically goes through 15 pads per day. Dr. Vogt discussed treatment options with plaintiff, but did not specify in the notes what those options included. (Tr. 615). On April 4, 2009, Dr. Vogt performed a genitourinary physical examination on plaintiff. Dr. Vogt reported normal results with no abnormalities. (Tr. 614).

On April 21, 2009, plaintiff was seen by Susan Jenner, MA, LPC for a therapy screening and assessment. (Tr. 637, 644-653). Plaintiff was described to have severe post traumatic stress disorder, in which she has flashbacks to her brain surgery; a fear of dying; moderate anxiety; moderate depression; moderate panic; and mild anger. (Tr. 645-646). She was given a Global Assessment of Functioning (GAF) score of 50.[9]

---

[9] A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text

(Tr. 651). Plaintiff returned for three therapy sessions with Christopher Anderson, LPC, LQM on April 22nd, April 27th, and May 13th. (Tr. 638-643). Her mood was consistently described as euthymic.

On April 30, 2009, plaintiff saw Dr. Edwards with complaints of itching and burning associated with urination. Plaintiff was diagnosed with a urinary tract infection. Dr. Edwards noted that plaintiff also suffered from back pain, depression, and anxiety. (Tr. 595-596). A letter, dated May 12, 2009, was written by Dr. Edwards for the purpose of addressing plaintiff's pending disability determination. (Tr. 508-509). Dr. Edwards expressed his opinion that plaintiff was legitimately unable to hold a job since September 2008 due to problems she encountered after her aneurysm surgery, chronic back pain, chronic urinary incontinence, and psychological issues.

On June 9, 2009 plaintiff saw Mindy Kendrick, APRN-BC at the Ozarks Community Hospital for a refills of Vicodin,[10] Zestril,[11] Hydrochlorothiazide,[12] Lipitor,[13] Oxybytynin,[14] and Naprosyn.[15] Plaintiff's diagnosis included back pain, hypertension,

---

Revision 34 (4th ed. 2000).

[10] Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain. Dependence or tolerance may occur. See Phys. Desk. Ref. 530-31 (60th ed. 2006).

[11] Zestril is a brand name for lisinopril, an ACE-inhibitor, used to treat high blood pressure and heart failure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html (last visited on Apr. 15, 2014).

[12] Hydrochlorothiazide is used to treat high blood pressure and fluid retention. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html (last visited on Apr. 15, 2014).

[13] Lipitor is used for the treatment of high cholesterol. See Phys. Desk Ref. 2495-96 (60th ed. 2006).

[14] Oxybutynin is used to treat overactive bladder (a condition in which the bladder muscles contract uncontrollably and cause frequent urination, urgent need to urinate, and inability to control urination. http://www.nlm.nih.gov/medlineplus/druginf

hyperlipidemia, and incontinence. (Tr. 588-589). On June 22, 2009, plaintiff went to the emergency room at the Ozarks Community Hospital with complaints of left foot pain after "stepping on door threshold." (Tr. 709-712). X-ray results revealed an acute displaced fracture and old second metatarsal head osteonecrosis with secondary MTP joint osteoarthritis. (Tr. 713). Plaintiff returned to Ms. Kendrick on July 1, 2009. The treatment notes are illegible. (Tr. 698).

On July 29, 2009, plaintiff saw her ophthalmologist, Dr. Hecox. Treatment notes state that plaintiff's filamentary keratitis reoccurred and that it was likely that it will continue to reoccur. Dr. Hecox stated that the medications prescribed have not healed her eye and that she will need to see a specialist for evaluation and other forms of treatment. (Tr. 517). On August 7, 2009, plaintiff went to the emergency room at the Ozarks Community Hospital with complaints of facial redness and swelling due to an allergic reaction. (Tr. 701-708).

On August 11, 2009, Dr. Edwards completed a medical source statement regarding plaintiff's physical abilities. (Tr. 631-632). Dr. Edwards reported that plaintiff ccould frequently lift and/or carry 5 pounds; occasionally lift and/or carry 10 pounds; continuously stand and/or walk for less than 15 minutes; stand and/or walk for less than 1 hour in an 8-hour day; sit continuously for 45 minutes at one time; sit for 1 hour in an 8-hour work day; push and/or pull with limitations; never climb, kneel, or crawl; occasionally balance, stoop, crouch, and handle; frequently reach, finger, feel, see, speak, and hear; avoid any exposure to heat, hazards, and heights; avoid

o/meds/a682141.html (last visited on Apr. 15, 2014).

[15] Naprosyn is a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendinitis and pain management. See Phys. Desk Ref. 2769-70 (60th ed. 2006).

-17-

moderate exposure to extreme cold, dust and fumes; and avoid concentrated exposure to weather wetness, humidity, and vibration. Dr. Edwards wrote that in an 8-hour workday, plaintiff would need to lie down or recline 3-4 times for 45 minutes each time in order to alleviate pain symptoms.

On August 20, 2009, Dr. Edwards saw plaintiff for sores on her lips and chronic cough. (Tr. 716). On the same day, Dr. Edwards completed a medical source statement regarding plaintiff's mental abilities. (Tr. 634-635). Dr. Edwards reported that plaintiff was markedly limited[16] in her ability to remember locations and work-like procedures; to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule; to maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruption from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to travel in unfamiliar places or use public transportation. Dr. Edwards reported that plaintiff was moderately limited[17] in her ability to work in coordination with or proximately to others without being distracted by them. Dr. Edwards reported that plaintiff was not significantly limited in her ability to understand, remember, and carry out very short and simple instructions; to sustain an ordinary routine without special supervision; to make simple work related decisions; to interact appropriately with the general public; to ask simple

---

[16] The medical source statement defines the term "markedly limited" as "more than moderate, but less extreme resulting in limitations that seriously interferes with the ability to function independently."

[17] The term "moderately limited" is defined as "impairment levels are compatible with some, but not all, useful functioning."

questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; and to set realistic goals or make plans independently of others.

On August 14, 2009, plaintiff saw Ms. Kendrick with the concern that one of her medications was causing redness and swelling. (Tr. 719). On August 31, 2009, plaintiff underwent a chest CT that revealed normal results. (Tr. 715). On September 17, 2009 and October 12, 2009, plaintiff saw Ms. Kendrick for medication refills. (Tr. 718, 828).

On December 3, 2009, plaintiff went to the emergency room of Ozarks Community Hospital for a rash on her legs, arms, and back. (Tr. 807-811). Plaintiff was diagnosed with neurogenic dermatitis and was prescribed Lexapro[18] and Atarax.[19] On December 14, 2009, plaintiff saw Ms. Kendrick for refills of Vicodin and Lexapro. (Tr. 827). On December 29, 2009, plaintiff returned to the emergency room with complaints of neck and shoulder pain and spasms. (Tr. 801-805). Plaintiff was prescribed Valium[20] for the pain. On January 10, 2010, plaintiff again went to the

[18] Lexapro, or escitalopram, is used to treat depression and generalized anxiety disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html (last visited Apr. 16, 2014).

[19] Atarax is the brand name for hydroxyzine and is used to relieve the itching caused by allergies and to control the nausea and vomiting caused by various conditions, including motion sickness. It is also used for anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html (last visited Apr. 16, 2014).

[20] Valium is the brand name for diazepam and is used to relieve anxiety, muscle spasms, and seizures. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682047.

emergency room with complaints of back pain. (Tr. 792-800). An x-ray of the cervical and thoracic spine revealed very mild thoracic spondylosis. (Tr. 800). Plaintiff was prescribed Percocet.[21]

On January 11, 2010, plaintiff saw Ms. Kendrick for pain between her shoulder blades. She was prescribed Lidoderm patches.[22] (Tr. 826). On January 19, 2010, plaintiff saw Ms. Kendrick for cold symptoms and medication refills. Plaintiff's diagnosis included acute bronchitis, tobacco abuse, chronic neck and back pain, and stable depression. (Tr. 825). On January 22, 2010, plaintiff saw Jay Baker, D.O. at a pain clinic with complaints of pain shoulder blade pain radiating into her left arm. (Tr. 781-782). The treatment records list plaintiff's diagnosis as cervicalgia and cervical radiculitis. Plaintiff underwent a cervical epidural steroid injection.

On January 25, 2010, plaintiff went to the Cherry Health Center with complaints of mid back pain and left shoulder pain. (Tr. 725-726). An x-ray was ordered of plaintiff's cervical and lumbar spine, which revealed mild diffuse lumbar degenerative disc disease and mild L5-S1 facet joint arthrosis. (Tr. 727). A second x-ray was ordered of her cervical and thoracic spine, which revealed radiographically very mild thoracic spondylosis. (Tr. 728). Plaintiff returned for a follow-up appointment on February 15, 2010, with complaints of cervical pain and lower left extremity numbness radiating to her index finger. Plaintiff was diagnosed with cervical spondylosis and

---

html (last visited Apr. 16, 2014).

[21] Percocet is a combination of oxycodone and acetaminophen. Ocycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. See Phys. Desk. Ref. 1114 (60th ed. 2006).

[22] Lidoderm is the brand name for lidocaine transdermal patch. It is a local anesthetic that is used to relieve pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603026.html (last visited Apr. 16, 2014).

congenital fusion at C3-4. (Tr. 729). Van Kinsey, D.O. administered a cervical facet injection at left C-5 through C-7. (Tr. 730). Plaintiff received additional injections on February 22, 2010 and March 1, 2010. Plaintiff reported that her pain decreased from a 9 to a 2 and that she was sleeping more comfortably throughout the night. (Tr. 735-738). On March 29, 2010, June 16, 2010, June 30, 2010, and July 6, 2010 plaintiff received additional medial facet injections, and on August 17, 2010, she received a medial branch block injection. (Tr. Tr. 842-851, 839-840).

On March 9, 2010, plaintiff saw Ms. Hendrick for a hydrocodone refill. (Tr. 824). On April 26, 2010, plaintiff went to the emergency room at the Ozarks Community Hospital with complaints of right toe redness, pain, and edema. (Tr. 785-788). An x-ray of the right foot revealed great toe distal phalanx exostoses, second metatarsal head osteonecrosis, small posterior calcaneal spur, and no acute fracture. (Tr. 789). She was discharged with a diagnosis of cellulitis. (Tr. 790).

On May 21, 2010, plaintiff saw Yung Hwang, M.D. for a disability determination evaluation examination (Tr. 747-753). Dr. Hwang wrote that plaintiff was able to understand and comprehend information quite well; had no vision, speaking or hearing difficulties; walked very straight with no limping; and used no assistive device despite complaining of low back pain. Dr. Hwang noted that plaintiff's claim of a pinched nerve was unsupported by the medical record. Dr. Hwang concluded that plaintiff was able to do minor employment, but would be unable to tolerate "labor work." (Tr. 751).

On June 2, 2010, a non-examining consultant completed a Physical Residual Functional Capacity Assessment (PRCFA) with respect to plaintiff.[23] (Tr. 122-128).

---

[23] The form indicates that the PRFCA was completed by a Single Decisionmaker (SDM). Missouri is one of 20 states in which nonmedical disability examiners are authorized to make certain initial determinations without requiring a medical or

Based on a review of the medical records, the consultant determined that plaintiff had the capacity to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday, with limitations on pushing and pulling using the upper extremities.  The consultant further determined that plaintiff can frequently climb ramps and stairs; frequently balance; occasionally climb ladders, ropes, and scaffolds; and occasionally stoop, kneel, crouch, and crawl.  She was restricted from concentrated exposure to vibrations and encountering hazards such as machinery or heights.

On the same day, Stephen Scher, Ph.D. completed a psychiatric review technique form. (Tr. 754-765).  Dr. Scher concluded that plaintiff suffered from non-severe affective disorders with mild difficulties in maintaining social functioning and maintaining concentration, persistence or pace.  Dr. Scher found no restriction of activities of daily living or repeated episodes of decomposition.  Dr. Scher wrote that "there is no evidence of severe functional limitations due to a discrete mental impairment alone.  These impairments, either singularly or in combination, do not significantly impact on the [plaintiff's] ability to perform basic work-related activities." (Tr. 764).

On August 20, 2010, plaintiff saw Ms. Kendrick for a refill on her Mentax[24] and Vicoden. (Tr. 821-822). On November 22, 2010, plaintiff saw Ms. Kendrick for refills

_____

psychological consultant's signature. See Office of the Inspector General, Audit Report Single Decisionmaker Model – Authority to Make Certain Disability Determinations without a Medical Consultant's Signature (Aug. 2013).

[24] Mentax is a cream indicated for the topical treatment of the dermatologic infection, tinea (pityriasis) versicolor. http://dailymed.nlm.nig.gov/dailymed/lookup. cfm?setid=167ecefd-4553-41b8-8160-81a48dbca076 (last visited Apr. 16, 2014).

of hydrocodone and Flexeril and requested a prescription for an Ambien.[25] (Tr. 820).

On December 21, 2010, plaintiff saw Kenneth Sharlin, M.D. for a neurological consultation with complaints of daytime sleepiness. (Tr. 813-815). Dr. Sharlin described plaintiff's condition as persistent disorder of initiating or maintaining wakefulness. Plaintiff was advised to schedule a diagnostic polysomnogram. On January 21, 2011, plaintiff saw Ms. Kendrick for Vicodin and Ambien refills. (Tr. 817).

On February 22, 2011, plaintiff saw J. Dasovich, M.D. at the Kitchen Clinic. The treatment notes summarize plaintiff's chronic issues as hypertension, hyperlipidemia, urinary incontinence, pain, narcotic use, and degenerative disc disease. Dr. Dasovich discontinued her Lipitor, Vesicare, Cozaar, and hydrocodone medications and began her on Simvastatin,[26] Oxybutynin,[27] Lisinopril,[28] Gabapentin.[29] (Tr. 834-835). On April 13, 2011, plaintiff returned to the Kitchen Clinic with complaints of constipation and continued low back pain. Plaintiff expressed an interest in quitting smoking. Plaintiff was given a prescription for lidocaine patches to alleviate her back pain and a Nicotrol

---

[25] Ambien is the brand name for zolpidem and is used to treat insomnia (difficulty falling asleep or staying asleep). http://www.nlm.nih.gov/medlineplus/drug info/meds/a693025.html (last visited Apr. 16, 2014).

[26] Simvastatin is used together with diet, weight-loss, and exercise to reduce the amount of fatty substances such as low density lipoprotein cholesterol and triglycerides in the blood. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692030.html (last visited Apr. 17, 2014).

[27] Oxybutynin is used to treat overactive bladder. http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682141.html (last visited Apr. 17, 2014).

[28] Lisinopril is used alone or in combination with other medications to treat high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html (last visited Apr. 17, 2014).

[29] Gabapentin is used to help control certain types of seizures in people who have epilepsy. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last visited Apr. 17, 2014).

inhaler to aid her with smoking cessation. (Tr. 833). On June 8, 2011, plaintiff presented to the Kitchen Clinic with a bloody left eye. Plaintiff reported that sometimes her right hip gives out and causes her to fall. Plaintiff was diagnosed with left eye subconjunctival hemorrhage. The notes stated that plaintiff had no difficulty with gait or arising from the exam table. (Tr. 831).

On July 25, 2011, plaintiff was examined by Charles Ash, M.D., who diagnosed possible degenerative arthritis in the cervical spine, lumbar spine, and right hip. (Tr. 769-770). Based on plaintiff's medical records and a physical examination, Dr. Ash determined that plaintiff had the capacity to frequently lift or carry up to 10 pounds; occasionally lift or carry 11 to 20 pounds; sit, stand, or walk for one hour without interruption; sit for a total of 8 hours in an 8-hour work day; stand for a total of 6 hours in an 8-hour work day; walk for a total of 6 hours in an 8-hour work day; frequently reach, handle, finger, feel, push, pull, or operate foot controls; occasionally climb stairs, balance, stoop, kneel, crouch, or crawl; and occasionally tolerate unprotected heights, moving mechanical parts, operating a motor vehicle, humidity/wetness, dust, odors, fumes, or pulmonary irritants, extreme cold or heat, and vibrations. (Tr. 771-776). Dr. Ash noted that plaintiff does not require the use of a cane or walker to ambulate, is able to shop, travel without assistance, use public transportation; climb a few steps at a reasonable pace; prepare a simple meal, care for personal hygiene, and sort paper or files. (Tr. 772).

On August 31, 2011, plaintiff returned to the Kitchen Clinic for a prescription refill. The majority of the treatment notes are illegible. (Tr. 854-857).

### III. The ALJ's Decision

In the decision issued on February 24, 2012, the ALJ made the following

findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2010.

2.  Plaintiff has not engaged in substantial gainful activity since October 19, 2007, the alleged onset date.

3.  Plaintiff has the following severe physical impairments: morbid obesity, nicotine abuse, mild degenerative disc disease of the lumbar spine with arthrosis and history of diagnosis of sacroiliitis, lumbago and sciatica, diffuse degenerative disc disease of the cervical spine with congenital cervical fusion, mild bilateral upper extremity cervicalgia, very mild spondylosis of the thoracic spine, insomnia/persistent disorder of wakefulness, stress urinary incontinence controlled with medication, history of left 5th metatarsal fracture with residual pain, right knee Baker's cyst, hyperlipidemia controlled with medication, diabetes mellitus II controlled with medication, history of headache, history of ruptured aneurysm, status post clipping with no residual effects, hypertension controlled with medication, depressive disorder, generalized anxiety disorder and post-traumatic stress disorder.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Plaintiff has the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that there is no reaching above the head bilaterally. With regard to movements of the neck, whether vertical or later flexion or extension, it is decreased throughout the use of the neck by 10 degrees in all directions. There is no pushing or pulling with the lower extremities bilaterally. Bending, twisting and turning when standing is occasionally, when seated is frequent. There is no crawling or kneeling for competitive purposes, but the claimant can retrieve items and use those positions to do that. Stooping and squatting is less than occasional, but can be performed. Climbing stairs is occasional, no ropes, ladders or scaffolds. Gripping and grasping wrist movements as well as handling, fingering and feeling, are both frequent. There is no pushing or pulling of levers with the upper extremities bilaterally. There is no use of air or vibrating tools or motor vehicles. There is no work at unprotected heights. There is no work in temperature extremes of cold, heat or humidity. There is no contact with the public and contact with supervisors anc co-workers is occasional. In addition, the claimant has a marked limitation in carrying our complex instructions.

6.      Plaintiff is unable to perform any past relevant work.

7.      Plaintiff was born on November 2, 1963 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.      Plaintiff has at least a high school education and is able to communicate in English.

9.      Plaintiff's transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills.

10.     Considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.     Plaintiff has not been under a disability, as defined in the Social Security Act, from October 19, 2007, through the date of this decision.

(Tr. 15-30).

## IV. Legal Standard

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own

description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v.

Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff contends that the ALJ erred by failing to resolve the conflict between the vocational expert's testimony and the Dictionary of Occupational Titles. Plaintiff further argues that the ALJ's decision denying benefits was not supported by substantial evidence. [Doc. #17].

## A. Vocational Expert Testimony

Plaintiff argues that the ALJ erred in relying on the vocational expert's testimony because it was in conflict with the Dictionary of Occupational Titles (DOT) and the ALJ failed to give a reasonable explanation in his decision as to how he resolved this conflict.

The DOT addresses "occupations," which are broad categories representing numerous jobs. See Social Security Ruling (SSR) 00-4p, 2000 WL 1898704, at *2. "'DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than the range.' The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs

as performed in particular establishments or at certain localities. In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000) (quoting Hall v. Chater, 109 F.3d 1255, 1259 (8th Cir. 1997)). Because the DOT only provides maximum requirements, a vocational expert is permitted to consider other reliable sources regarding available jobs in the national or local economy. See 20 C.F.R. § 404.1566. However, an ALJ must inquire about any apparent conflicts between the DOT and a vocational expert's testimony. See Social Security Ruling (SSR) 00-4p, at *4. If there is a conflict, the ALJ may rely on the expert testimony as long as the record contains persuasive evidence to support the deviation. Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995).

In the instant case, the vocational expert testified that plaintiff had the functional ability to work as a production assembler, an electronics assembler, or a hand packer. The vocational expert described these jobs as sedentary, unskilled occupations. The ALJ asked whether this testimony was consistent with the DOT. The vocational expert testified that it was not consistent with the DOT because the DOT defines the production assembler and electronics assembler jobs as light work and the hand packer job as medium work. The vocational expert justified her re-categorization of the exertional levels by explaining that she relied on the Department of Labor's Unskilled Employment Quarterly Ledger, which defined the three jobs as sedentary occupations. The vocational expert then testified that there were 750 jobs within the state of Missouri for a production assembler, 1,400 jobs within the state of Missouri for an electronics assembler, and 1,200 jobs within the state of Missouri for a hand packer.

Although the Unskilled Employment Quarterly Ledger may conflict with the DOT, it is considered to be a reliable source for vocational experts to reference when determining exertional levels or estimates of available jobs. See e.g. Cook v. Astrue, 2011 WL 3665334, *9 (E.D. Wash. Aug. 22, 2011); Koonce v. Apfel, 1999 WL 7864, *5 (4th Cir. 1999); Rikard v. Astrue, 2008 WL 250580, *5 n. 1 (W.D. Mo. Jan. 28, 2008). However, although a vocational expert may rely on the Unskilled Employment Quarterly Ledger, the vocational expert must provide a sufficient justification for any conflict with the DOT. See Johnson, 60 F.3d at 1435. If the conflict is not resolved at the hearing, the ALJ must clarify the discrepancy in his opinion. See SSR 00-4p.

For example, in Cook v. Astrue, 2011 WL 3665334, there was a conflict between the vocational expert's testimony and the DOT. The court found that the ALJ did not err in relying on the testimony because the vocational expert explained at the hearing that she relied on the Unskilled Employment Quarterly Ledger and a labor market survey to determine that some portion of the jobs that the DOT defined as light were actually performed in a seated position and, thus, were more appropriately classified as sedentary. Id. at *9. The court found that this explanation was a sufficient justification for the conflict.

In contrast to Cook v. Astrue, the vocational expert in this case did not provide any explanation for why she placed more weight on the exertional levels from the Unskilled Employment Quarterly Ledger than the exertional levels from the DOT and the ALJ did not resolve this conflict in his opinion. See Tr. 29, 70-71. "To the extent a conflict exists, the ALJ must elicit a reasonable explanation for such a conflict and thereafter resolve it." Allhouse v. Commissioner of Social Security, 2008 WL 4372646, *10 (E.D. Mich. Sept. 19, 2008). No such explanation was elicited in this case. In light

of this unresolved conflict, substantial evidence on the record does not support the ALJ's reliance on the vocational expert's testimony regarding the question of whether plaintiff can perform jobs in the national economy. Thus, the Court finds that remand is appropriate.

## B. Residual Functional Capacity

Plaintiff further argues that the ALJ's decision was not supported by substantial evidence because: (1) the ALJ failed to give proper weight to the August 11, 2009 medical source statements completed by Dr. Brian Edwards; and (2) the ALJ improperly failed to consider her medication side effects.

In deciding whether a claimant is disabled, the ALJ considers medical opinions along with "the rest of the relevant evidence" in the record. 20 C.F.R. § 404.1527(b). The opinion of a treating source may be given controlling weight where it is well-supported by clinical and laboratory diagnostic techniques and is not inconsistent with the record as a whole. 20 C.F.R. § 404.1527(c)(2). When an ALJ discounts a treating physician's opinion, he must give good reasons for doing so." Martise v. Astrue, 641 F.3d 909, 925 (8th Cir. 2011); 20 C.F.R. § 404.1527(d)(2). Furthermore, the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment." Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998) (internal quotations and citations omitted).

Dr. Edwards completed a two-page medical source statement regarding plaintiff's physical abilities. (Tr. 631-632). Dr. Edwards reported that plaintiff was able to frequently lift and/or carry 5 pounds; occasionally lift and/or carry 10 pounds; continuously stand and/or walk for less than 15 minutes; stand and/or walk for less than 1 hour in an 8-hour day; sit continuously for 45 minutes at one time; sit for 1

-32-

hour in an 8-hour work day; push and/or pull with limitations; never climb, kneel, or crawl; occasionally balance, stoop, crouch, and handle; and frequently reach, finger, feel, see, speak, and hear. Dr. Edwards opined that plaintiff should avoid any exposure to heat, hazards, and heights; avoid moderate exposure to extreme cold, dust and fumes; and avoid concentrated exposure to weather wetness, humidity, and vibration. Dr. Edwards wrote that in an 8-hour workday, plaintiff would need to lie down or recline 3-4 times for 45 minutes each time in order to alleviate pain symptoms. Dr. Edwards also completed an additional two-page medical source statement regarding plaintiff's mental abilities. (Tr. 634-635). Dr. Edwards reported that plaintiff was markedly and moderately limited in various mental capacities.

The ALJ gave no evidentiary weight to either of Dr. Edwards' medical source statements because: (1) Dr. Edwards' contact with plaintiff was limited in duration; (2) his opinions seemed to give undue weight to plaintiff's subjective complaints; (3) he did not cite to any specific medical examinations or tests to support his opinions; (4) his limitations were not supported by contemporaneous office or progress notes; and (5) there was no evidence that he had the expertise to form opinions regarding plaintiff's primarily orthopedic and mental conditions. [Doc. #10-3, at p. 26].

The Court finds that the ALJ gave good reasons for attributing no weight to the medical observations of Dr. Edwards. As the ALJ noted, the medical record reflects that Dr. Edwards' contact with plaintiff was of a limited duration. See 20 C.F.R. § 404.1527(d) (ALJ may consider the length of the treatment relationship and the frequency of treatment). Dr. Edwards saw plaintiff three times prior to completing his medical source statements and these three visits involved medical issues unrelated to the opinions provided in the medical source statements. (Tr. 595, 597-598). The first

visit was on January 29, 2009 for sinus congestion; the second visit was on March 3, 2009 for issues with urinary incontinence; and the third time was on April 30, 2009 for complaints of itching and burning during urination. Dr. Edwards' treatment notes did not indicate any concern for plaintiff's mental health or discuss any of plaintiff's physical limitations. In fact, his treatment notes are devoid of any evidence that he personally performed a physical or mental examination on plaintiff. See Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (ALJ did not err in refusing to give treating-source weight to doctor who met with claimant three times).

Furthermore, Dr. Edwards' opinions are conclusory and not based on sufficient medical or diagnostic data. The medical source statements contain eight sets of checklists. Dr. Edwards did not cite to any medical evidence and provided no elaboration or explanation for his answers. "The checklist format, generality, and incompleteness of the assessments limit evidentiary value." Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). "A treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague conclusory statements." Piepgras v. Charter, 76 F.3d 233, 236 (8th Cir. 1966); see also Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007); 20 C.F.R. § 404.1527(d)(3) (more weight will be given to an opinion when the physician provides relevant evidence, such as medical signs, in support of his opinion). Thus, the Court finds that the ALJ did not err in assessing the weight to be afforded to the opinion of Dr. Edwards.

The plaintiff additionally argues that the ALJ erred by failing to properly consider her medication side effects. Plaintiff does not identify which side effects, in particular, the ALJ failed to discuss. However, after careful review of the ALJ's decision, the Court

finds that the ALJ's conclusions are supported by substantial evidence. The ALJ's decision thoroughly summarizes plaintiff's medical history, including the results of plaintiff's objective diagnostic tests and the medical opinions of Dr. Ash, Dr. Edwards, Dr. Paff, Dr. Yung, and Dr. Scher. The ALJ weighed the opinions of plaintiff's treating physicians and consultative examiners and appropriately assessed plaintiff's credibility. The ALJ also considered the fact that plaintiff did not require the assistance of an ambulation device, that her impairments were stable, and that she had received fairly conservative treatment. Thus, the ALJ's opinion is supported by substantial evidence on the record as a whole.

### VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner properly determined plaintiff's residual functional capacity. However, the Court also finds that that the Commissioner failed to address the conflict between the vocational expert testimony and the DOT and, thus, improperly relied on the testimony.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 25th day of August, 2014.